IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

ROBERT HERNANDEZ,

    Plaintiff,

vs.                                                                             No. CIV 02-0333 JB/RHS

CITY OF ALBUQUERQUE, and
TOM BENARD,

    Defendants.

**MEMORANDUM OPINION AND ORDER**

    **THIS MATTER** comes before the Court on the Defendant Tom Benard's Motion in Limine to Exclude Portions of the Testimony of Dr. Alan J. Watts; or in the Alternative, Motion for a Daubert Hearing, filed December 9, 2003 (Doc. 241). The Court held a Daubert hearing on December 29, 2003. The primary issue is whether the Court should exclude Watts from testifying at trial that the head wound the Plaintiff, Robert Hernandez, received is consistent with a blow by an asp. Because Watts assumes that there was a blow by a blunt object, and that assumption involves the ultimate issue the jury will need to decide, the Court is not persuaded that his testimony will be helpful to the jury on the issues at trial. Accordingly, the Court will grant the motion and exclude Watts as a witness at trial.

**BACKGROUND**

    Hernandez alleges that Benard violated his constitutional rights when Benard used excessive force against him, striking him with an asp. Hernandez suffered a ½ inch wound to his head. Hernandez retained Watts, a physicist with 34 years of experience to review the facts, determine, and subsequently testify whether the injuries to Hernandez' head are consistent with the allegations that

he makes in the Complaint.  See Initial Rule 26 Disclosures at 9.

      Watts possesses a Ph.D. in Physics, a science that deals with matter and energy, and their interactions in the field of mechanics.  See Watts' Resume at 1.  Watts is an accredited physicist with practical experience dealing in force analysis, shock physics, impact damage effects, and biomechanics.  See id.  Watts has given expert testimony in body force analysis and biomechanics in almost every judicial district in New Mexico, as well as in the Federal District Court of New Mexico. See id.  He has also testified in several foreign jurisdictions.  See id.  Many attorneys have consulted and/or retained Watts in the past, including Benard's counsel.  See Watts' Case List at 4, 6.  Watts has authored and/or co-authored numerous scientific papers and articles, as well as a book in which at least one chapter deals with impact injuries to the head and brain.  See Watts' Resume at 5-8.

      Watts' earlier career focused on the area of weapons research and design.  See Deposition of Alan J. Watts at 35:2-10 (taken April 15, 2003).  Later, Watts began to focus on biomechanics in the context of legal consulting.  See id. at 35:11-15.  Watts is not a trained medical doctor, a neurologist, or a forensic pathologist.  Indeed, he has no formal medical or forensic training.  See id. at 32:18-21.  Watts also testified that he is not an expert in police procedures and has no knowledge of correct or incorrect police operating procedures.  See id. at 28:11-21.  He has no experience as a law enforcement officer or in the use or handling of an asp, nor has he witnessed someone struck by an asp.  See id. at 32:7-13; Transcript of Daubert Hearing at 104:15 to 105:6 (December 29, 2003)("Transcript").[1]

      The Court held a Daubert hearing on December 29, 2003.  In addition to hearing arguments

---

[1] The Court's citations to the transcript refer to the Court Reporter's original, unedited version.  Any finalized version may contain slightly different page and/or line numbers.

from counsel, the Court heard testimony and cross-examination of Watts. See Clerk's Minutes at 3, filed December 29, 2003 (Doc. 257). Watts testified for approximately one hour and 10 minutes. See id.

## ANALYSIS

Hernandez wants Watts to testify about his scientific knowledge, but the issue is whether what he says will be of any assistance to the jury. While Watts has the expertise to testify about the speed of an asp blow, the Court does not think he can say much more. Watts does not appear qualified to testify regarding the other opinions that he offers. And if Watts can properly testify only to the speed of an asp blow, the question is whether that is really helpful to the fact finder.

**I.    ALL PROPOSED EXPERT TESTIMONY MUST SATISFY THE REQUIREMENTS AS EXPRESSED IN RULE 702, DAUBERT, AND KUMHO TIRE TO ENSURE THAT THE EXPERT'S TESTIMONY IS BOTH RELEVANT AND RELIABLE.**

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702. As discussed in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), and as refined in Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137 (1999), the purpose of rule 702 is to ensure that all expert testimony is both relevant and reliable. Thus, the Court must perform a "gatekeeping inquiry . . . tied to the facts of a particular case" to determine if the proposed expert testimony is properly admitted. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. at 150 (internal quotation marks and citation omitted); Smith v. Ingersoll-Rand Co., 214 F.3d 1235, 1243 (10th Cir.

2000)("[T]he gatekeeping function is a flexible and commonsense undertaking in which the trial judge is granted 'broad latitude' in deciding both how to determine reliability as well as in the ultimate decision of whether the testimony is reliable.")(citing Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. at 141-42.).

The Supreme Court significantly clarified the scope of Daubert v. Merrell Dow Pharms., Inc. in Kumho Tire, holding the district court's rule 702 gatekeeping duties apply to all expert testimony, whether the expert bases his or her testimony on scientific, technical, or other specialized knowledge. See Smith v. Ingersoll-Rand Co., 214 F.3d at 1243. The purpose of the Daubert gatekeeping function is not to measure every expert by an inflexible set of criteria, but to undertake whatever inquiry is necessary to "make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." Id. at 152. The trial judge in all cases of proffered expert testimony must find that it is properly grounded, well reasoned, and not speculative before he or she admits the evidence. See Fed. R. Evid. 702, Advisory Committee Notes (2000 Amend.).

First and foremost, to determine whether Watts may testify at trial, the Court must determine whether he is competent to testify as an expert. See City of Chanute v. Williams Natural Gas Co., 743 F. Supp. 1437, 1444 (D. Kan. 1990). Additionally, to be reliable under Daubert, the expert must derive his or her inference or assertion by a proper method and must support his or her opinion by appropriate validation -- i.e., good grounds, based on what is known. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. at 590. Hernandez must show that "the method employed by [Watts] in reaching the conclusion is scientifically sound and that the opinion is based on facts which satisfy Rule

702's reliability requirements." Dodge v. Cotter Corp., 328 F.3d 1212, 1222 (10th Cir. 2003)(citation omitted).

While expert opinions "must be based on facts which enable [the expert] to express a reasonably accurate conclusion as opposed to conjecture or speculation, . . . absolute certainty is not required." Id. (quoting Gomez v. Martin Marietta Corp., 50 F.3d 1511, 1519 (10th Cir. 1995)). Hernandez need not prove that Watts is undisputably correct or that his conclusions/opinions are generally accepted. See Mitchell v. Gencorp, Inc., 165 F.3d 778, 781 (10th Cir. 1999). Instead, Hernandez need only show that the method which Watts used in reaching his conclusion is sound and that the opinions are based on facts which satisfy rule 702's reliability requirements. See id.

In Daubert v. Merrell Dow Pharms., Inc., the court set forth five non-exhaustive factors to aid the court's function in ensuring reliability: (i) whether the theory or scientific technique can be tested or has been tested; (ii) whether the theory or technique has been subjected to peer review and publication; (iii) whether there is a known or potential rate of error associated with the methodology; (iv) whether there are standards controlling the technique's operation and whether they were maintained; and (v) whether the theory or technique is generally accepted within the relevant community. See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. at 593-94. The Court "may" apply these factors if necessary, but the "specific factors neither necessarily nor exclusively appl[y] to all experts or in every case." Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. at 141. District courts have broad discretion to consider a variety of other factors. See Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. at 150.

## II. WATTS' TESTIMONY WILL NOT BE HELPFUL TO THE JURY IN DECIDING THE ISSUES IN THIS CASE.

To arrive at his general opinion on causation, Watts reviewed scientific literature, drew general propositions therefrom, and then combined those propositions to conclude that an asp blow could have caused the injury to Hernandez' head. See Watts Depo. at 14-17. His proposed testimony, however, has an important limitation: Watts will not testify that the asp blow caused the injury, but only that the wound is consistent with an asp blow or that the asp blow could have caused the wound. See Transcript at 116:23 to 117:7. What is in dispute is whether the asp caused the head wound. And Watts testifies that he cannot determine whether blunt trauma caused the wound. See id. at 109:13-17.

Watts does not know what object caused Hernandez' head wound. See id. And because he is not medically trained or trained as a pathologist, he cannot and should not testify about the nature of the injury. Thus, all that Watts can say is that the wound is consistent with a strike by an asp.

Watts did not attempt to determine what caused Hernandez' head wound. See id. Rather, Watts assumes that there was a blow by a blunt object. See id. at 105:10-17. Specifically, he assumes that the wound was caused by a blunt object and not by a sharp object. See id. He did not make that determination himself. See id. He simply relied upon what he was told. See id.

Thus, Watts assumes what needs to be determined. His testimony does not help the jury do what it needs to do – that is, decide what caused the wound. After the jury decides whether Benard hit Hernandez in the head, they can use Watts' testimony to tell them the wound is consistent with an asp blow. That testimony will not be helpful to the jury.

The Court might still be persuaded to admit this marginally helpful testimony as harmless

except that Watts also says that the wound is consistent with a cut. See id. at 110:6-25. Watts admits that he did not see a photograph of the wound after it was cleaned up. See id. at 111:7-9. He also testified that he did not investigate whether a cut, which requires less energy than an asp blow, could have caused the head wound. See id. at 110-6-25. Hence, Watts not only cannot say with any certainty what caused the wound, but he also cannot rule out other possible causes. Thus, the Court does not think that will be helpful to the task before the jury at trial, and will exclude the testimony.

Further, the Court is concerned that, because Watts does have impressive credentials, an impressive presence and manner, and is a highly qualified expert in certain fields, his testimony on an issue that is not helpful will convey the impression that he thinks an asp did cause the wound. That would be unfair to Benard. Thus, the unfair prejudice of the testimony substantially outweighs the probative value of the proposed testimony.

### III. WATTS' PROPOSED TESTIMONY FAILS TO SATISFY THE RELIABILITY REQUIREMENT OF DAUBERT AND KUMHO TIRE.

Benard argues that the Court should exclude Watts' testimony for four reasons: (i) his opinion is based upon unsound and incomplete scientific principles regarding the alleged ASP strike; (ii) he is not a medical doctor and cannot offer testimony regarding the nature of wound that Hernandez sustained, blood spatter or pooling, and/or injuries that would occur as a result of a head strike; (iii) he is not an expert in police procedures and the Court should thus not allow him to testify regarding the officers' conduct at the scene; and (iv) he cannot state that the alleged ASP strike was the only source of trauma to Hernandez' head, because he does not have all of the factual evidence. The Court will start with the last argument first.

### A.   INCOMPLETE FACTUAL EVIDENCE

Benard argues that the factual information that Hernandez provided to Watts surrounding the April, 2000 incident was incomplete. Watts bases his opinion, in part, on the fact that Hernandez could not have sustained it during the motor vehicle chase or the vehicle accident. See Transcript at 92:3-13. But as discussed above, Watts assumes the issue that the jury must decide. Watts' speed calculations assume that a blunt object, i.e., an asp, caused the wound. See id. at 112:11-17. Again, Watts does not help the jury determine whether Benard hit Hernandez in the head with an asp. Watts assumes that he did.

Watts testified at his deposition that he did not do any calculations concerning the speed of impact of Hernandez' vehicle because he "wasn't provided any data" allowing him to do that. See Watts Depo. at 46:21-24; id. at 47:22-25. Watts was aware that Hernandez' vehicle struck and obliterated a lamp post, and then struck a wall before his vehicle came to rest. See id. at 47:13-25. Nevertheless, Watts did not measure these forces or consider such forces in formulating his opinions. See id. Watts testified that he cannot rule out these forces "but [he] saw nothing in the description of the accident that would lead [him] to believe that the crash itself was the cause of any problem" and that he "would need to know the specifics of how the crash occurred before [he] could really give a serious answer to that." Id. at 48:6-16.

Hernandez asserts Watts, using the principles of physics, explained in great detail why, in his opinion, the head injury did not result from the vehicle crash. See Transcript at 100:11 to 101:1. The extent of Watts' explanation, however, appears to be that because Hernandez' head and body would move forward as a result of the impact, one would not expect this type of injury to the back of the head. See id. This explanation is not helpful to the jury. The Court does not believe that it is beyond

the scope of an average juror's knowledge. Moreover, Watts testified that Hernandez would "rebound slightly" after impacting the air bag. Id. at 100:21-23. He does not, however, address whether the injury could have been inflicted at that point.

The Court will exclude Watts' testimony. If he did not do any calculations concerning the speed of the vehicle when it crashed, the Court does not understand how he can conclude the vehicle impact did not cause the injury to Hernandez' head. As a result, this case is one in which too great an analytical gap exists between the data and opinion. Watts has not provided a sufficient factual or other basis to state that the impacts which Hernandez sustained during the motor vehicle chase could not have caused the alleged head injury. The evidentiary rules require more than speculation. See Dodge v. Cotter Corp., 328 F.3d at 1222. Accordingly, Watts' methodology to determine the speed of an asp in this case may be scientifically sound under the principles of physics, but his opinion, which suggests that an asp was the only object that could have caused Hernandez' wound, does not reasonably flow from the data upon which he relies.

### B. UNSOUND AND INCOMPLETE SCIENTIFIC PRINCIPLES.

Watts formulated his opinion that Benard struck Hernandez in the head with an asp, in part, based upon how fast an average person can swing various objects. See Watts Depo. at 16:17-18. Specifically, Watts testified that his "analysis implied certain inferred speeds that . . . were well within the capability of a typical adult," relying upon a book entitled "The Science and Folklore of Baseball," by Robert Watts and Terry Bahill. See id. at 17:1-11. The basis of his analysis is how fast an average adult can swing a baseball bat, i.e., the inferred speed, not an expandable baton or an asp. See id. at 16:20-24.

Watts' proposed opinion is problematic, because Watts does not calculate the force necessary

-9-

to create certain injuries. See id. at 36:10-21. For example, he does not calculate the force necessary to create a laceration to the head. Rather than doing these calculations of other forces that might cause a head wound, Watts "read the literature that quote such forces" and adopts its findings. See id. Watts does not rely, however, upon any literature that discusses the force or speed necessary to inflict an injury by an asp or the speeds at which an average adult can swing an asp. See id. at 17:1-11. Watts testified in relation to swinging an asp or expandable baton:

> Q: Do you have any information on how fast an asp can be brought down, at what speed a typical person or a normal person would do it? Is there any data on that?
>
> A: I'm not aware of any, but treating it as a variation of a bat, the answer is you could easily swing it at up to 60 or 70 miles an hour . . . .

Id. at 97:8-16.

Thus, Watts is unaware of any existing data concerning the speed at which typical adult can swing an asp. See id. He does, however, explain how he reached his conclusion. See id. at 82:14 to 83:16; id. at 85:10 to 86:20. He pointed to an objective source to show that he followed the scientific method, as it is practiced by at least a recognized minority of scientists in Watts' field. See id. at 14:8-23; id. at 17:1-22; id. at 36:11-21.

Benard argues that Watts' testimony fails to satisfy the Daubert factors because: (i) he has not provided the Court with the assurance that the data regarding speeds and forces applicable to baseball bats are readily applied to expandable batons or asps; (ii) he has not assured the Court that such application has been tested and/or accepted within the relevant community; and (iii) he has not established that he is qualified to give such opinions assuming such an analogy is appropriate. But Benard does not object to Watts' qualifications to testify as an expert in the field of biomechanics.

And Watts' credentials generally qualify him as an expert to give testimony as to the

relationship between impact and injury. Case law supports allowing such testimony. See, e.g., Arnold v. Riddell, Inc., 882 F. Supp. 979, 989-90 (D. Kan. 1995)(permitting biomechanical engineer to testify about causation of injury from various forces); Dorsett v. American Isuzu Motors Inc., 805 F. Supp. 1212, 1226 (E.D. Pa. 1992)(holding that biomechanical engineer could testify as to injuries caused by rollover of vehicle); Madrid v. University of California, 105 N.M. 715, 716, 737 P.2d 74, 75 (1987)(holding that "[i]t is common knowledge that frequently those most knowledgeable in biomechanics, relating to the relationship between trauma and injury, are Ph.D.'s not M.D.'s."); Baerwald v. Flores, 122 N.M. 679, 683-84, 930 P.2d 816, 820-21 (Ct. App. 1996)(finding that biomechanical experts may properly testify about the relationship between trauma and injury). And Watts has been qualified to give expert opinion testimony regarding body force analysis, biomechanics and blood spatters, and holds a Ph.D. in physics.

As Watts testified, while the specifics of each case will differ, the physics is the same in all cases. See Transcript at 78:9-24. Accordingly, it boils down to applying the laws of mechanics to the human body. Mechanics is a part of physics. See id. To arrive at specific causation, Watts looked at how much energy would be required to cause Hernandez' injury, took into account the weight and dimensions of the asp, the contact area, and then calculated the impact speed required to account for the injury. See Watts Depo. at 82:18 to 83:1-2; id. at 94:1 to 95:10.

Under Daubert, Watts' opinion about the speed of the asp which was allegedly brought down on Hernandez' head is reliable. See, e.g., Karns v. Emerson Elec. Co., 817 F.2d 1452, 1459 (10th Cir. 1987); Daubert v. Merrell Dow Pharms., Inc., 43 F.3d 1311, 1319 (9th Cir. 1995)(holding that experts must explain how conclusions were reached to establish reliability of the testimony); United States v. Rincon, 28 F.3d 921, 924 (9th Cir. 1994)(holding that research must be described in

sufficient detail for district court to determine the research was scientifically valid); Cummins v. Lyle Indus., 93 F.3d 362, 369 (7th Cir. 1996). When Watts testifies about the speed of the asp, he is within the reasonable confines of his subject matter. He is qualified as an expert pursuant to rule 702 on biomechanics. He can testify about the speed of an asp blow. The Court is not convinced, however, that this testimony is helpful to the jury.

Apparently realizing that problem, Watts suggests that he might be able to go further. Somewhat inconsistent with some of the testimony discussed above, Watts testified that he considered all plausible causes of Hernandez' injury – the motor vehicle accident, the passenger door frame, a gun, items on Benard's utility belt, etc. – and then, based on the force and speed necessary to produce the injury, ruled out the least plausible causes until only the most likely cause remained – a deliberate asp blow. See Watts Depo. at 100-106. As explained above, Watts does not adequately explain the basis for his conclusion that the head wound could not have occurred during the vehicle crash. With respect to each other alternative, Watts dismisses the possibility based on his assumption that Hernandez' wound was caused by blunt trauma rather than by a sharp object. See id. That assumption, however, rests entirely upon other people's characterization of the wound. See id. at 104:11 to 105:11. Such a basis does not satisfy Daubert's reliability standard, and the Court will exclude testimony regarding the speed of an asp strike and the likelihood that alternative sources did not cause Hernandez' wound.

### C.     IMPROPER MEDICAL AND/OR FORENSIC PATHOLOGY OPINIONS.

Watts also proposes to testify about the resulting injury, but the Court does not believe that his opinion on the injury is reliable. Despite his lack of medical and forensic training, Watts bases his conclusions upon medical or forensic principles:

-12-

> The existence of some limited blood spatter to the right of Mr. Hernandez strongly suggests that a *second* blow was delivered. The logic is as follows. During a short-lived blunt impact the blood does *not* immediately flow profusely (this only occurs due to sharp instrument penetration into arteries, or due to bullets, etc.). Rather, the blood starts to "well up" and forms a pool at the injury strike point. However, if a subsequent blow is then delivered onto the same region the pooling blood can now be spattered.

See Rule 26 Expert Report at 5 (emphasis in original). Based upon his testimony, however, Watts is not qualified to discuss injuries that may or may not occur from an asp strike or what object would cause immediate blood flow or a blood pool beneath the skin.

Hernandez nevertheless contends that Watts' opinion regarding blood spatter and causation of the wound are proper and admissible. Hernandez contends that a witness may be qualified as an expert on the basis of "knowledge, skill, experience [or] training." Fed. R. Evid. 702. In reaching his conclusion, Watts reviewed scientific literature regarding blood stain evidence, see Watts Depo. at 15:15 to 16:13; reviewed photographs showing the pooling of blood and blood spots to the right side of Hernandez with small "tails" pointing away from Hernandez; Rule 26 Expert Report at 2; and concluded that a blow delivered at his previously calculated impact speed of 23 to 38 mph would give the observed "low velocity" splatter, Id. at 5.

Watts' lack of specialization as a medical doctor, a neurologist, or a forensic pathologist affects the admissibility of this opinion, not just the weight the jury would give to that opinion. He has read a book on blood spatters, and while spatters may be a matter of physics, Watts cannot eliminate causes; he can only tell the jury that Hernandez' wound is consistent with the physics of a second asp blow. While the movement of fluids is generally within the realm of physics, Watts proposed testimony regarding blood spatter is outside his area of expertise.

Watts testified that the blood spatters could be consistent with Hernandez shaking his head.

-13-

See Transcript at 113:7-22. Watts testified that the blood spatters are consistent with Hernandez' body being moved. See id. The spatter could have been consistent with a blow into existing pool of blood. See id. at 89:11-21. The spatter could have come from blood dripping off something. See id.

The Court does not think Watts' opinion tells the jury what it needs to determine the issue here, i.e., whether Hernandez was struck by a blunt object. Watts does not know what caused the blood spatters. See id. at 89:11-21; 113:7-22. While, on cross-examination, opposing counsel can usually use his or her opportunity to ferret out any weakness in a party's evidence to ensure the jury properly evaluates the testimony's weight and credibility, the Court has a special role in screening experts that it does not have with other evidence. See Goebel v. Denver & Rio Grande Western R. Co., 346 F.3d 987, 994 (10th Cir. 2003)(noting that vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence)(citing Daubert v. Merrell Dow Pharms., Inc., 509 U.S. at 596). Accordingly, the Court will not permit Hernandez to admit Watts' testimony regarding blood splatter.

The Court is also not convinced that Watts is qualified to give opinions discussing injuries resulting from an alleged strike to the head, such as the dizziness Hernandez alleges. See Rule 26 Expert Report at 2. Such an opinion should be reserved for a medical doctor or someone with specialized training in symptoms. Watts does not have any more training or knowledge on physical symptoms than the average juror.

The Court will also preclude Watts from testifying about the nature of the wound that Hernandez sustained. Watts suggested that an asp caused the wound on Hernandez' head because

it would not be possible to sustain such a wound by any other means. Benard contends that Watts misinterpreted the term "laceration" as something different than a "cut." Watts testified that he looked up the two terms in standard dictionaries and forensic pathology books and found that the term "cut" is used to describe any parting of the skin. Transcript at 98:5-13. If the injury is inflicted with a sharp object it is called an "incision." Id. at 98:14-16. The term "laceration" is used when the skin is crushed or torn to produce a ragged cut. Id. at 98:16-19. For the purposes of his analysis and opinions, Watts assumed that Hernandez' head wound was a "laceration" resulting from blunt trauma rather than a sharp object. Id. at 98:20-24. Hernandez argues that Watts properly relied on these interpretations and definitions to conclude that Hernandez' injuries were the result of blunt trauma – i.e., an asp blow.

The inappropriateness of Watts' testimony is underscored by the deposition testimony of Dr. Mark Berger, Hernandez' expert and a physician. Berger testified that a laceration and a cut, medically, are the same thing. See Deposition of Mark Berger at 11:16 to 12:3 (taken April 16, 2003). Berger also testified that Hernandez' wound, whether caused by a blunt trauma, a jagged cut, or a smooth surgical cut, would fall within the term laceration. See id. There is the very real possibility that Watts improperly interpreted medical reports and medical terms to formulate his opinions. Dr. Berger's deposition testimony shows that medically trained experts would likely reach a different conclusion than Watts.

The Court need not and should not decide on this motion whether Watts correctly interpreted the difference between a laceration and/or a cut. All the Court needs to decide is that the reasoning behind Watts' opinion requires some basis in medical principles. For example, Watts assumes or decides that blunt trauma caused Hernandez' wound to the head and that the wound was a laceration

versus a cut.  At his deposition, Watts testified:

> Q: [S]ince you can't determine whether it was a blunt trauma or a sharp trauma, if you take out the fact that you believe this was a blunt trauma, then that could explain an eight-tenths of an inch cut on the back of the head?
>
> A: Well, the catch for that logic . . . is you just showed me an exhibit which was the medical exhibit which, itself, described it as blunt trauma, not a cut.
>
> Q: Where does it say blunt trauma?  In which exhibit? Show me where it says blunt trauma.
>
> A: The one you showed me just now.
>
> Q: This one, the hospital record says "blunt trauma?"
>
> A:  Yes, sir.
>
> Q:  Now, is that reporting what Mr. Hernandez said he was hit in the back of the head with a blunt object, or is that the medical?  Where do you see blunt trauma?
>
> A: Evaluation and management.  It calls it "blunt contact."
>
> Q: And that's based upon the history that Mr. Hernandez gave?
>
> A: Well, I'm assuming the emergency medical boys would state it wasn't if they disagreed.  They keep referring to it as blunt trauma.
>
> Q: Where else did they refer to it as blunt trauma?
>
> A: Well, they're calling it a laceration, to start with, which is not what you mean by a sharp object.
>
> * * * *
>
> Q: So you have ruled out that causing the cut or the laceration without even knowing what objects could have come in contact with him; is that correct?
>
> A: On the basis that it's blunt trauma and not a sharp cut.
>
> * * * *
>
> Q: Now, you're assuming laceration means that it couldn't be a cut.  That's how you

>   interpret that medical term; is that correct?
>
>   A: My understanding is that's how the medics interpret that medical term.
>
>   Q: But you're not a medic?
>
>   A: No.
>
>   Q: You've never written a medical report?
>
>   A. No, sir. But I have books on medicine, and that's the way they describe it.

Watts Depo. at 104:6 to 105:11; id. at 106:18-23; id. 107:14-23. Watts is thus interpreting medical reports and medical terms to formulate his opinions. Watts does not have the expertise to conduct such interpretation. Moreover, Watts' opinions are unreliable to the extent that he does not consider the possibility that a sharp object caused Hernandez' head wound. Accordingly, the Court will exclude Watts' opinions that rely upon medical or forensic principles. See Fed. R. Evid. 702.

### D. ALBUQUERQUE POLICE DEPARTMENT AND POLICIES.

Watts also expresses opinions that rely upon police procedures and policies. See Rule 26 Expert Report at 5. For instance, Watts concludes that the officers at the scene "were anxious to quickly hand-cuff [Hernandez] and 'secure' him," leading to high adrenaline levels. See id. Watts also stated that Benard "was probably 'running on adrenaline' and failed to follow correct procedure." Id.

Hernandez concedes that Watts is not an expert in police procedure and relied on what Hernandez gave him in the form of quotes from other police officers coupled with common sense to conclude that Benard failed to follow correct procedure. Hence, given that Watts is not an expert in police procedures and has no knowledge about police operating procedures, the Court will not allow Watts to testify concerning police procedures, similar to those described above. Likewise, the

-17-

Court will not permit Watts to comment on the conduct of any of the officers at the scene, specifically whether the conduct was appropriate or inappropriate. He also should not testify to the psychological or physiological effects of an officer responding to stimuli during the effectuation of an arrest.

**IT IS THEREFORE ORDERED** that Defendant Tom Benard's Motion in Limine to Exclude Portions of the Testimony of Dr. Alan J. Watts; or in the Alternative, Motion for a Daubert Hearing is granted. The Court will exclude the proposed testimony of Dr. Watts at trial.

_____
UNITED STATES DISTRICT JUDGE

Counsel:

Anthony James Ayala
Albuquerque, New Mexico

    *Attorney for the Plaintiff*


Norman F. Weiss
Alisa R. Wigley
Simone, Roberts & Weiss, P.A.
Albuquerque, New Mexico

    *Attorneys for the Defendant Tom Benard*


Stephanie M. Griffin
   Assistant City Attorney
Albuquerque, New Mexico

    *Attorney for the Defendant City of Albuquerque*